IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ARTHUR HEBBELER, *et al.*,
 *Plaintiffs*,

v.

Civil Action No. ELH-17-3641

FIRST MARINER BANK,
 *Defendant*.

## MEMORANDUM OPINION

This case is rooted in a foreclosure action filed in a Maryland court in 2017, concerning the home of plaintiffs Arthur and Deborah Hebbeler. Plaintiffs have sued their mortgage lender, First Mariner Bank ("FMB" or the "Bank"), alleging, *inter alia*, breach of contract, fraud, and violations of state and federal law. ECF 2 (Complaint).[1] A supplement to the Complaint is docketed at ECF 19.

The Complaint contains nine counts, as follows: "Violations of the Maryland Consumer Protection Act" ("MCPA"), Md. Code (2013 Repl. Vol., 2017 Supp.), §§ 13-101 *et seq.* of the Commercial Law Article ("C.L.") (Count I); "Detrimenal [sic] Reliance" (Count II); Breach of Contract (Count III); Negligence (Count IV); Unjust Enrichment (Count V); "Violations of the Real Estate Settlement Procedures Act" ("RESPA"), 12 U.S.C. §§ 2601 *et seq.* (Count VI); Fraud (Count VII); Declaratory Judgment (Count VIII); and Injunctive Relief (Count IX). *See* ECF 2.

---

[1] The case was originally filed in the Circuit Court for Baltimore City and was removed to this Court by the Bank on the basis of federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331, 1446. *See* ECF 1 (Notice of Removal). According to Felipe Rojas, former Vice President and Collections Manager at the Bank, FMB has been acquired by Howard Bank. *See* ECF 56-4 (Rojas Affidavit), ¶ 2.

By Memorandum Opinion (ECF 20) and Order (ECF 21) of October 10, 2018, the Court dismissed Counts I, VII, VIII, and IX.

On May 17, 2019, FMB filed a combined First Amended Answer, along with eighteen affirmative defenses, Counterclaims and a Cross Claim against the U.S. Small Business Administration ("SBA"). *See* ECF 42. As to the Hebbelers, the Bank alleges Fraud (Count I); tortious interference with economic relationships (Count II); breach of contract (Count III); and unjust enrichment (Count IV). ECF 42. And, as to plaintiffs and the SBA, it seeks a declaratory judgment (Count V). *Id.* The Bank does not appear to have requested summons as to the SBA. Thus, the SBA has never been served.

Three motions are pending. The Hebbelers have moved to dismiss or, alternatively, for summary judgment as to FMB's Counterclaims and Cross Claim. ECF 43. The motion is supported by a memorandum of law (ECF 43-1) (collectively, the "Hebbeler Motion") and several exhibits. ECF 43-2 to ECF 43-9. The Hebbelers have also moved for summary judgment with respect to several of FMB's affirmative defenses. ECF 46 (the "Hebbeler Defenses Motion"). The Bank has filed a consolidated opposition to the Hebbeler Motion and cross motion for summary judgment with respect to the entire Complaint as well as Counts II and III of the Bank's Counterclaims (ECF 56). It is supported by a memorandum of law (ECF 56-1) (collectively, the "FMB Motion") and multiple exhibits. ECF 56-2 to ECF 56-28. Plaintiffs have filed a combined opposition to the FMB Motion and a reply to the Hebbeler Motion. ECF 57 (the "Hebbeler Opposition"). FMB has replied to the Hebbeler Opposition. ECF 58 (the "FMB Reply").

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant the FMB Motion as to the Complaint. I shall also grant the Hebbeler Motion as to Counts I, III, IV, and V of the Counterclaims, but I shall deny the Hebbeler Motion as to

Count II.  I shall deny the FMB Motion as to Counts II and III of the Counterclaims.  I shall also deny the Hebbeler Defenses Motion, as moot.

As to the SBA, Fed. R. Civ. P. 4(m) requires a plaintiff to serve a defendant "within 90 days after the complaint is filed."  If a defendant is not served within that time, "the court ... must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  *Id.*  The Cross Claim was filed on May 17, 2019.  Because the SBA has not been served, I shall dismiss the suit as against the SBA.

## I.       Factual and Procedural Background

The Hebbelers obtained a mortgage of $420,000 from FMB in July 2002, secured by their home on Hilton Avenue in Catonsville, Maryland (the "Property").  ECF 56-17 at 1, 5.  The mortgage note specified that plaintiffs were required to make monthly mortgage payments of $2,936.71.  ECF 56-24 at 1.  The deed was recorded on February 19, 2003.  ECF 56-17 at 1.

The Hebbelers defaulted on their mortgage on March 6, 2012.  ECF 56-5 at 1, ¶ R.4.  On January 30, 2013, FMB filed a foreclosure action against the Hebbelers in the Circuit Court for Baltimore County.  ECF 56-4, ¶ 5; ECF 56-18 at 2; *see Hartman v. Hebbeler*, No. 03C13001068 (Balt. Co. Cir. Ct. filed Jan. 30, 2013).  According to Felipe Rojas, who was then Vice President and Collections Manager of FMB, the Hebbelers had an indebtedness of $427,311.32.  ECF 56-4, ¶¶ 2, 5.  However, the foreclosure action was dismissed on April 8, 2014.  ECF 56-4, ¶ 5; ECF 56-18 at 3.

On July 29, 2014, FMB filed another foreclosure action against the Hebbelers.  ECF 56-4, ¶ 6; ECF 56-19 at 1; *see Hartman v. Hebbeler*, No. 03C14008113 (Balt. Co. Cir. Ct. filed July 29, 2014).  At that point, the Hebbelers allegedly owed $419,853.10.  ECF 56-4, ¶ 6.  On October 30, 2014, the parties engaged in mediation, but no agreement was reached.  ECF 56-19 at 2.  The

Circuit Court for Baltimore County issued an order on November 7, 2014, permitting the secured party to schedule the foreclosure sale. *Id.* at 3. The sale was scheduled for May 13, 2015. ECF 56-5 at 1, ¶ R.10. However, in lieu of the sale, the parties entered into a Forbearance Agreement in May 2015. ECF 56-5 ("Forbearance Agreement" or "Agreement"). The second foreclosure action was dismissed, without prejudice, on July 27, 2016. ECF 56-4, ¶ 9; ECF 56-19 at 3.

According to the Forbearance Agreement, the amount then due under the loan agreements totaled $449,347.31. ECF 56-5 at 2, Section 4. Moreover, plaintiffs were in arrears totaling $101,931.66. *Id.*, Section 5.

The Forbearance Agreement provided that the Bank would forbear from foreclosing on the Property so long as plaintiffs complied with its terms. *Id.* at 1, ¶ R.11. Notably, FMB agreed to "forbear from the exercise of its default rights and remedies. . . until the occurrence of an Event of Default." *Id.* at 3, Section 6. The Forbearance Agreement also included a payment schedule, by which plaintiffs were to pay $68,000 immediately; an additional $20,284.78 by May 29, 2015; and $13,646.88 by August 1, 2015. *Id.* at 3, Section 7. Therefore, under the Agreement, the Hebbelers were to pay a total of $101,931.66 by August 1, 2015.

The Forbearance Agreement provides that the "breach" of "any of the provisions of th[e] Agreement" shall be considered an "Event of Default," allowing FMB to "exercise any and all of its default rights and remedies . . . including . . . foreclosing on the Property." ECF 56-5 at 4-5, Sections 11, 12. The Agreement also specifies that the "failure of [plaintiffs] to comply with . . . any of the provisions of the Loan Documents" would constitute another "Event of Default." *Id.* at 4, Section 11. Further, FMB agreed to "cancel the currently scheduled Foreclosure Sale upon receipt of the First Forbearance Installment Payment" and agreed "not [to] reschedule any

foreclosure sale, provided no Event of Default subsequently occurs. . . ." ECF 56-5 at 3, Section 6.

FMB's records reflect that the Hebbelers paid $67,000 on May 14, 2015; $7,200 on May 28, 2015; $1,800 on June 16, 2015; and, $21,984.78 on August 15, 2015, *i.e.*, after the August 1, 2015 deadline. ECF 56-20 at 5. Therefore, they paid a total of $97,984.78, but were, according to the Bank, $3,946.88 short of the amount to which they had agreed under the Agreement. However, the Hebbelers contend that in May and June of 2015, they delivered two additional checks to the Bank, Check No. 1448 and Check No. 1483, one for $1,800 and one for $2,500, totaling $4,300. ECF 56-6 at 3; *see* ECF 56-20 at 2. They insist that the Bank failed to apply these checks to their debt obligation. *See* ECF 56-20 at 2. Thus, they claim that they paid a total of $102,284.78.

Notably, for more than a year after the alleged submission of the two checks, the Hebbelers did not realize the Bank had not cashed the checks, nor did they alert the Bank of their alleged payments. ECF 56-1 at 11; *see* ECF 56-20 at 2. Plaintiffs assert, ECF 2, ¶ 23:

> [T]he parties entered into the Forbearance Agreement on May 11, 2015, and, at that time, the arrears totaled $101,931.66. . . Even without Check Nos. 1448 and 1483, by FMB's own admission, the homeowners had paid at least $97,984.78 since May 11, 2015. . . Given that the amount of the homeowners' monthly mortgage payments was $2,936.71 under the Note, the amount paid (as reflected by FMB's records) after May 11, 2015 totaled the entire arrears minus one-and-a-half monthly payments. Thus, FMB's records should have noted the mortgage paid at least through March 1, 2015.

For its part, the Bank contends that it did not receive the two disputed checks. ECF 56-1 at 11; ECF 56-4, ¶ 17. And, the Bank contends that the Hebbelers stopped making mortgage payments altogether after March 18, 2016. ECF 56-4, ¶ 19.

Mr. Hebbeler sent numerous emails to the Bank between August 2015 and August 2016. ECF 19-3; ECF 56-4, ¶¶ 9-15, 26, 30, 31, 32. In an email of August 4, 2015, Mr. Hebbeler said

he was "looking for an accurate statement, as the ones prepared 21 May, 21 June, and 21 July (roughly) were not even close to correct." ECF 19-3 at 2. The following day, Mr. Hebbeler emailed Rojas, stating that four checks were in the mail: "One for the balance past due from the Forbearance (mortgage part), and three to cover July, August, and Sept monthly payments." *Id.* at 3. In an email of August 18, 2015, Mr. Hebbeler wrote to Rojas to confirm that the checks had been received. *Id.* at 5. Rojas responded the same day, stating that he would look into it. *Id.* at 4. By email of August 24, 2015, Mr. Hebbeler complained to Rojas that the September statement was not correct, "even accounting for the late processing of our checks sent 8/3." *Id.* at 7. And, by email of September 22, 2015, Mr. Hebbeler asserted: "The statement is wrong, AGAIN! This is now six months that it has been wrong and six months that we have asked for it to be corrected. Please address this ASAP. Our records show we are current (probably ahead a bit) and the foreclosure actions should be terminated." *Id.* at 8.

In an email of October 2, 2015, Mr. Hebbeler asked Rojas why the statement was still incorrect, noting that "checks clearly marked Sept and Oct 2015" that were sent to the Bank in August had been marked "late."[2] *Id.* at 9. Mr. Hebbeler followed up on October 30, 2015, stating: "Been a month, Felipe. . . . still haven't seen an accurate statement." *Id.* at 10. In an email of November 3, 2015, Mr. Hebbeler noted some improvement in the statement's accuracy, but said that it was "still off by at least $25000 that was wired from my sister back in May." *Id.* He also claimed the interest and late fees needed to be corrected. *Id.* By email of March 19, 2016, Mr. Hebbeler summarized a meeting he had with Rojas a few days earlier. *Id.* at 12. Mr. Hebbeler stated that FMB's information was not current and claimed that there were "payments missing

---

[2] The email does not specify the year, but presumably Mr. Hebbeler was referring to the checks he referenced in his email of August 5, 2015. *See* ECF 19-3 at 3, 7.

since May of 2015." *Id.* Mr. Hebbeler noted that he would "go through [their] records and present records to [Rojas] of all payments which have been made since November 2014." *Id.*

In an email in May 2016, plaintiffs asserted that they had attempted to make additional payments in May and June of 2015, totaling $4,300, but the Bank had not cashed the checks. ECF 56-4, ¶ 31.[3] On May 16, 2016, Rojas informed Mr. Hebbeler that the Bank had not received those checks. ECF 56-23; ECF 56-4, ¶ 32.

On July 18, 2016, Rojas sent an email to Mr. Hebbeler, stating that it had been "4 months since [FMB] received any type of payment on [plaintiffs'] loan." ECF 56-20 at 3. In Mr. Hebbeler's response of August 9, 2016, he asserted that plaintiffs had sent FMB checks in May and June[4] that had not cleared. *Id.* at 2. These payments, according to Mr. Hebbeler, were intended to be part of the payment under the Agreement. *Id.* He said: "[A]ll we can assume is that they were lost in the process of being processed on [FMB's] end." *Id.* He also stated that plaintiffs were still waiting for an accurate statement from FMB, which had not "done the best job in posting payments or sending accurate statements." *Id.* He also asked FMB "to come to a middle ground" by allowing plaintiffs to refinance the mortgage at a lower interest rate, applying all legal fees associated with plaintiffs' prior default towards the mortgage balance, and amending FMB's reporting to the credit bureaus to show plaintiffs in good standing for the prior three months. *Id.* at 2-3.

Rojas responded, attaching the bills sent by the Bank for the preceding six months, and "an accounting of all payments made and the application therefore since 5/11/15." *Id.* at 1, 5-19. He

_____

[3] The Court was not provided with a copy of the email. The email is referenced in Rojas's Affidavit.

[4] Mr. Hebbeler's email does not specify the year. But, in context, it appears that he was referring to the checks he claims to have sent to the Bank in May and June of 2015.

stated: "Until you can provide evidence the Bank's accounting is incorrect we cannot come to a resolution of the outstanding principal, interest, escrow and fees. The Bank cannot assist you without confirming the balances owed." *Id.* Further, Rojas stated, *id.*:

> Please provide evidence of your disputed amounts over the past 6 months so the Bank can research our records. The account remains in delinquency status and we need to resolve this as soon as possible. Without a resolution by September 9, 2016, the bank will have no other option than to refer your account to our outside counsel for review.

As the emails reflect, Mr. Hebbeler complained about "payments missing since May of 2015" and other inaccuracies in the Bank's statements. *See*, *e.g.*, ECF 19-3 at 12 (email of 3/19/16). However, there is no reference in the record to checks 1448 and 1483 until May 16, 2016, *i.e.*, about a year after they were allegedly submitted to the Bank. The reference consists of an email of May 16, 2016, from the Bank in response to Mr. Hebbeler, indicating that these checks were "not received." ECF 19-3 at 17. And, it is not until an email of August 9, 2016, that Mr. Hebbeler specifically claimed that plaintiffs had hand delivered these two checks to the Bank in mid 2015, and that they had not "cleared." *See* ECF 56-20 at 2. He indicated that plaintiffs "assume[d] that "they were lost" by the Bank. *Id.*

In addition to emails, Mr. Hebbeler sent several letters to the Bank. He characterized his letter of October 25, 2016, as a "Notice of Error & Request for Information," pursuant to "Regulation X of the Mortgage Servicing Act. . . ." ECF 19-4 at 2. In this letter, he claimed that FMB failed to apply payments to his mortgage, and he requested documentation of his loan. *Id.* In a letter of November 21, 2016, he objected to the Bank's response to what appears to be two letters he sent to the Bank in October 2016. *Id.* at 4-5.

On February 2, 2017, the Bank sent the Hebbelers a Notice of Intent to Foreclose. ECF 56-21 at 2-4. The notice stated that the last payment received by the Bank from the Hebbelers

was on March 18, 2016, and that the "mortgage was 1,008 days past due and in default." *Id.* at 4. Plaintiffs were advised that the amount required to cure the default was $76,415.60. *Id.* Mr. Hebbeler responded by letter to the Bank's lawyer on February 24, 2017. ECF 19-4 at 6. He indicated that the debt stated in the Notice of Intent to Foreclose was inaccurate because it did not reflect all of the Hebbelers' payments. *Id.*

FMB's counsel replied by letter of March 10, 2017. ECF 56-21. He told Mr. Hebbeler that he was incorrect, and that numerous bank statements reflecting this had been sent to him. *Id.*. Further, the Bank's lawyer stated that in a letter dated November 9, 2016, he had "requested that [Mr. Hebbeler] specifically identify which payments [he had] made that [he contends] have not been reflected" on the bank statements, but Mr. Hebbeler had not done so. *Id.* He also stated: "Attached hereto are documents responsive to your Qualified Written Request, presuming that your letter is a Qualified Written Request." *Id.* The Bank appended to the letter a copy of the "Notice Of Intent To Foreclose" dated February 2, 2017. ECF 56-21 at 2.

On September 11, 2017, C. Edward Hartman, III, substitute trustee for FMB (ECF 56-3, ¶¶ 2, 3), commenced a third foreclosure action against the Hebbelers in the Circuit Court for Baltimore County. ECF 56-22 at 1; *see Hartman v. Hebbeler*, No. 03C17008945 (Balt. Co. Cir. Ct. filed Sept. 11, 2017) (the "Third Foreclosure Action"). Thereafter, on November 1, 2017, the Hebbelers filed the case sub judice in the Circuit Court for Baltimore City. ECF 2. As noted, FMB removed that case to this Court. ECF 1.

In regard to the Third Foreclosure Action, the Hebbelers filed a "motion to stay and dismiss" on February 6, 2018. ECF 56-6 at 1, 25 (the "Motion to Stay"). The factual allegations recited in the Motion to Stay are nearly identical to those in the Complaint filed in this case.

*Compare* ECF 56-6 at 2-7 *with* ECF 2 at 2-8.  On March 8, 2018, the Circuit Court for Baltimore County denied the Motion to Stay.  ECF 56-8.

In the meantime, on March 13, 2018, Jeffrey Rhyne signed a "Contract Of Sale" to purchase the Property, for the sum of $435,000.  ECF 56-10 at 1, 4.  The circuit court docket reflects a Report of Sale filed on March 16, 2018.  ECF 56-22 at 6-7.  The Hebbelers filed "Exceptions To Sale" on April 16, 2018.  ECF 56-11 ("Exceptions").  The factual allegations laid out in the Exceptions are the same as those set forth in the Hebbelers' earlier Motion to Stay.  The docket for the Third Foreclosure Action reflects that on October 22, 2018, the circuit court held a hearing as to the Hebbelers' Exceptions.  ECF 56-22 at 8-9.  And, on October 24, 2018, the circuit court overruled the Exceptions.  *Id.* at 9.  Then, on October 29, 2018, the Circuit Court for Baltimore County issued a "ratification report of sale."  ECF 56-22 at 9.[5] A Motion for Judgment Awarding Possession was filed on November 7, 2018.  *Id.*

On November 14, 2018, the Hebbelers filed a notice of appeal to the Maryland Court of Special Appeals.  *Id.* at 10.[6]  The circuit court issued a "Judgment Awarding Possession" on January 22, 2019, awarding possession of the Property to "Jeff Ryne" [sic] and "Melinda Bunnell-Rhyne."  ECF 43-6.  Soon after, in February 2019, the Hebbelers were evicted from the Property. ECF 56-3 (Hartman Affidavit), ¶ 25.

When the Rhynes attempted to obtain title insurance for the Property, they discovered that the Hebbelers had obtained a loan from the Small Business Administration, secured by the Property.  *See* ECF 56-14.  The Bank was alerted to the lien in an email of December 17, 2018.

---

[5] Hartman's Affidavit indicates that the sale was ratified on October 22, 2018.  ECF 56-3, ¶¶ 19, 21.  But, the circuit court did not issue an order for the "final ratification report of sale" until October 29, 2018.  ECF 56-22 at 9.

[6] As discussed, *infra*, the appeal was later dismissed.

*Id.* Counsel for the Hebbelers wrote to counsel for the Rhynes on February 4, 2019 (ECF 56-15), acknowledging that the Hebbelers had obtained an SBA loan for $106,400.00 on September 25, 2018, secured by the Property. ECF 56-15; *see* ECF 43-4. However, plaintiffs' counsel claimed the Hebbelers were "within their legal rights to obtain the loan, and pledge the property as collateral, as they held legal title . . . because the auction sale was not ratified until October 29, 2018." ECF 56-15. And, he indicated that if the Rhynes proceeded with evicting the Hebbelers, the Hebbelers would "most likely stop making [SBA loan] payments," which would result in a foreclosure as to the Property. But, the Hebbelers offered to continue with the loan payments if the Rhynes "agree[d] to sell the property back to them" for what the Rhynes had paid. *Id.*

The Hebbelers' lawyer stated, in part, *id.*:

Obviously, if the Hebbelers were to cease making payments on the loan, the SBA would foreclose on the property. The property would be sold for a fraction of its value at another auction, and $106,400.00 of the proceeds would be paid to the SBA. This would result in a financial loss to your clients. As the Hebbelers had a right to obtain the loan, your clients would have no recourse.

My clients are willing to continue making timely payments on the SBA loan, if your clients agree to sell the property back to them at the same purchase price paid by your clients for the property. This would result in zero loss to your clients. However, if your clients instead opt to proceed with an eviction, the Hebbelers will most likely stop making payments, leading to the said loss for your clients. . . .

As noted, in March 2018, Mr. Rhyne had signed a contract to buy the Property. ECF 56-10. Emails between Arthur Hebbeler and James Henderson, a loan specialist with the SBA, indicate that the Hebbelers subsequently filed for a disaster loan, which was approved on September 12, 2018. ECF 43-3 at 1.[7] The Rhynes did not sign the "Settlement Statement" until March 19, 2019. ECF 43-7.

_____

[7] As discussed, *infra*, FMB alleges that the Hebbelers fraudulently obtained the loan from the SBA after the Property had been sold to the Rhynes. ECF 42 at 14.

Additional facts are included, *infra*.

## II.    Legal Standards

As to the Complaint, the Hebbelers' claims for detrimental reliance, breach of contract, negligence, unjust enrichment, and violations of RESPA (Counts II, III, IV, and VI) survived the Bank's motion to dismiss. *See* Memorandum Opinion (ECF 20) and Order (ECF 21) of August 10, 2018. The Bank subsequently filed the Counterclaims and Cross claim against plaintiffs. ECF 42.

The Bank has moved for summary judgment as to the plaintiffs' suit and as to Counts II and III of its Counterclaims. ECF 56. The Hebbelers moved for summary judgment as to the Bank's affirmative defenses. ECF 46. But, as to FMB's Counterclaims and Cross Claim, the Hebbelers have moved to dismiss or, in the alternative, for summary judgment. ECF 43. A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to

notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[8]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

Summary judgment is ordinarily inappropriate "where the parties have not had an opportunity for reasonable discovery." *Kolon Indus., Inc.*, 637 F.3d at 448-49. As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam). But, this is not such a case.

The suit was removed to this Court in December 2017. *See* ECF 1. On October 10, 2018, after disposition of a motion to dismiss, this Court issued a Scheduling Order, by which discovery

---

[8] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

was to close on April 8, 2019. ECF 24 at 2. On January 10, 2019, FMB filed its motion to amend its answer and to add the Counterclaims and Cross Claim. ECF 27. The Counterclaims and Cross Claim were based on actions taken by the Hebbelers in the few months preceding the filing of the FMB Motion, when they sought and obtained the SBA loan. ECF 27 at 2.

I referred the case to Judge Beth Gesner on April 9, 2019, for resolution of discovery disputes. ECF 35. On May 6, 2019, Judge Gesner approved the Bank's request to extend discovery to May 7, 2019. ECF 39. And, by Memorandum (ECF 40) and Order (ECF 41) of May 17, 2019, I approved FMB's motion to amend its answer and to add the Counterclaims and Cross Claim.

By that point, discovery had just closed. However, the Hebbelers were aware of the Bank's potential claims as early as January 2019, when the Bank filed its motion to amend. *See* ECF 27. Moreover, there was no request to reopen discovery as to the Counterclaims.

I conclude that the parties have had ample opportunity to conduct discovery. And, the Hebbelers seek summary judgment. Therefore, I shall construe the Hebbeler Motion as one for summary judgment. It follows that all motions will be considered under Rule 56.

Under Rule 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). To preclude the award of summary judgment, the nonmoving party must

demonstrate that there are disputes of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied,* 540 U.S. 822 (2003) (citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Merely because both sides have moved for summary judgment, this does not mean that summary judgment to one party or another is necessarily appropriate. If there is a genuine issue of material fact, both motions must be denied. *See* 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

In discussing the facts, and as to the analysis of certain claims, I make reference to legal proceedings that occurred in a Maryland State court. "[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor and City Council of Balt.*, 791 F.3d 500, 508

(4th Cir. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825, 132 S.Ct. 115, 181 L.Ed.2d 39 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Of relevance here, it is not uncommon for a court to take "judicial notice of ascertainable facts [in] the content of court records." *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989).

### III.    Discussion

### A.  The FMB Motion

### 1.  Res Judicata Generally

FMB argues that the "Circuit Court for Baltimore County has finally ratified the sale of the Property to the Rhynes." ECF 56-1 at 14. Therefore, it contends that "all counts of the Hebbelers' Complaint are barred by *res judicata* and collateral estoppel because these claims were previously decided by a Maryland state court and cannot be reasserted in this court." *Id.* The party who asserts res judicata has the burden of establishing its application. *Bennett v. Garner*, 913 F.3d 436, 440 (4th Cir. 2019).

The Latin phrase "*res judicata*," translated literally into English as "a thing decided," *see* BLACK'S LAW DICTIONARY 1470 (rev. 4th ed. 1968), is the name of a legal doctrine that "bars a party from relitigating a claim that was decided or could have been decided in an original suit." *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161 (4th Cir. 2008); *see Meekins v. United*

*Trans. Union,* 946 F.2d 1054, 1057 (4th Cir. 1991). Res judicata, also known as claim preclusion, is a judicial doctrine by which "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153 (1979); *see SAS Inst., Inc. v. World Programming Ltd.*, 847 F.3d 370, 378 (4th Cir. 2017).

In sum, res judicata is a "'practical' doctrine" that asks "whether the party has previously had a fair shot with respect to the claims raised in the present action." *SAS Inst.*, 847 F.3d at 378 (citation omitted). If so, the doctrine precludes parties from "contesting matters that they have had a full and fair opportunity to litigate," thereby reducing the "expense and vexation attending multiple lawsuits, conserves judicial resources," and avoids "inconsistent decisions." *See Montana*, 440 U.S. at 153-54; *SAS Inst.*, 847 F.3d 3at 378; *Laurel Sand & Gravel, Inc.*, 519 F.3d at 161-62. Moreover, res judicata extends to claims that could have been asserted and litigated in the original suit. *FWB Bank v. Richman*, 354 Md. 472, 493, 731 A.2d 916, 927 (1999). When a court "'is on notice'" that the issues presented in a suit have been "'previously decided . . . the court may dismiss the action *sua sponte*,'" *i.e.*, on its own initiative. *Arizona v. California*, 530 U.S. 392, 413 (2000) (citation omitted); *accord Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 (4th Cir. 2006).

The applicable law for purposes of claim preclusion in federal court is the law of the tribunal in which the prior judgment was entered. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). The Fourth Circuit has said: "Generally, the preclusive effect of a judgment rendered in state court is determined by the law of the state in which the judgment was rendered." *Laurel Sand & Gravel, Inc.*, 519 F.3d at 162; *accord Jones v. HSBC Bank USA, N.A.*, 444 F. App'x 640, 643 (4th Cir. 2011) (per curiam); *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 127 (4th Cir. 2000); *see Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293

(2005).

Under Maryland law, res judicata bars claims where "'(1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been raised and determined in the prior litigation; and (3) there was a final judgment on the merits in the prior litigation.'" C*ochran v. Griffith Energy Servs., Inc.*, 426 Md. 134, 140, 43 A.3d 999, 1002 (2012) (citation omitted); *accord Powell v. Breslin*, 430 Md. 52, 63-64, 59 A.3d 531, 538 (2013).

This doctrine comports with federal law. *See*, *e.g.*, *Pension Benefit Guar. Corp. v. Beverley,* 404 F.3d 243, 248 (4th Cir. 2005); *Meekins*, 946 F.2d at 1057. Notably, "[t]he elements of res judicata under federal law are analogous to those under Maryland law[.]" *Anne Arundel Cty. Bd. of Educ. v. Norville*, 390 Md. 93, 108, 887 A.2d 1029, 1037 (2005); *see also Providence Hall Assoc. Ltd. P'shp v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 276 (4th Cir. 2016); *Clodfelter v. Republic of Sudan,* 720 F.3d 199, 210 (4th Cir. 2013); *SAS Inst.*, 847 F.3d at 378 (describing federal res judicata test).

As indicated, the doctrine of res judicata "precludes the assertion of a claim after a judgment on the merits in a prior suit by the same parties on the same cause of action." *Meekins,* 946 F.2d at 1057. Additionally, "'[n]ot only does res judicata bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'" *Id.* (quoting *Peugeot Motors of America, Inc. v. E. Auto Distribs., Inc.,* 892 F.2d 335, 359 (4th Cir. 1989)).

A cause of action is "identical" for purposes of res judicata if it "involves a right arising out of the same transaction or series of connected transactions that gave rise to the claims in the

first action." *Harnett v. Billman*, 800 F.2d 1308, 1314 (4th Cir. 1986). Res judicata thereby accounts for "'issues that . . . could have been raised in that [first] action.'" *San Remo Hotel, L.P. v. City and Cty. of San Francisco, Cal.*, 545 U.S. 323, 336 n.16 (2005) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)); *see* Restatement (Second) of Judgments § 24(2) cmt. c (1982) ("Restatement").

On the other hand, res judicata does not bar a claim that could not have been brought in the earlier litigation. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955). The controlling issue is whether the claim existed at the time of the prior suit, not whether plaintiff had actual knowledge of the claim at that time. *Aliff v. Joy Mfg. Co.*, 914 F.2d 39, 43 (4th Cir. 1990). "An exception to the general principle that lack of knowledge will not avoid the application of res judicata rules is found in cases where fraud, concealment, or misrepresentation have caused the plaintiff to fail to include a claim in a former action." *Harnett*, 800 F.2d at 1313.

A cause of action is "identical" for purposes of res judicata if it "involves a right arising out of the same transaction or series of connected transactions that gave rise to the claims in the first action." *Harnett*, 800 F.2d at 1314. In deciding whether a factual grouping constitutes a "transaction," the RESTATEMENT gives "weight to such considerations as whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id.* § 24(2). Notably, "[a] plaintiff's invocation of a different legal theory in the subsequent action" does not preclude application of res judicata. *Onawola v. Johns Hopkins Univ.*, AMD-07-870, 2007 WL 5428683, at *1 (D. Md. Sept. 24, 2007) (citing *Harnett*, 800 F.2d at 1314).

In *Bilbrough*, 309 Md. at 495, 525 A.2d at 236, the Maryland Court of Appeals said: "[I]t seems to be settled here that a mere change in the legal theory, applied to the same set of facts

previously litigated, will not in and of itself avoid claim preclusion." The court also observed, *id.* at 497, 525 A.2d at 237: "'The present trend is to see [a] claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories'. . . ." (Citation omitted).

What the Maryland Court of Appeals said in *Richman*, 354 Md. at 493, 731 A.2d at 927, is also instructive:

> When an earlier court has actually ruled on the matter sought to be litigated in a second court, the "same claim" analysis is usually straightforward. It is when . . . the earlier court has *not* directly ruled upon the matter that the analysis becomes more complex, for then the second court must determine whether the matter currently before it was fairly included within the claim or action that was before the earlier court and *could* have been resolved in that court.

(Emphasis in *Richman*). Writing for the court, Judge Wilner continued: "It has long been established that judgment between the same parties or their privies upon the same cause of action is conclusive 'not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit.'" (Citations omitted).

The cases discussed above make clear that a plaintiff's suit based on new legal theories does not enable him to avoid the bar of res judicata.

### 2. Analysis

FMB argues that the Hebbelers' entire Complaint is barred by res judicata. ECF 56-1 at 15. It argues that Hartman, the plaintiff in the state foreclosure cases, was the substitute trustee for FMB and is in privity with FMB because "[i]dentical interests exist with respect to the parties in both actions as Mr. Hartman acted on behalf of and for the interests of the Bank." *Id.* at 16-17. According to FMB, this case presents identical claims as the Third Foreclosure Action because the factual underpinnings of both suits are "so similar that the allegations in the Complaint filed in this case are essentially the same as those made by the Hebbelers in the foreclosure action." *Id.* at 18.

And, FMB contends that the Third Foreclosure Action was "adjudicated on the merits with finality." *Id.*

The Hebbelers contend that res judicata does not apply. ECF 57-1 at 20. However, they "take issue only with the second element of *res judicata*—identical causes of action." *Id.* Essentially, they argue that the Third Foreclosure Action was based on the mortgage note, while this case is based on the Forbearance Agreement. *Id.* at 21. The two cases, in the Hebbelers' view, arise out of different transactions, because the Forbearance Agreement "did not negate the underlying foreclosure-triggering default, " *i.e.*, a default on the mortgage note itself. *Id.*

### a. Identity of Parties or their Privies

In his Affidavit, Hartman states: "As the Substitute Trustee, I represent the interests of First Mariner Bank. . . I initiated the third. . . foreclosure [case] against the Hebbelers . . . because the Hebbelers failed to pay their mortgage for over sixteen (16) months and, as such, failed to comply with the Forbearance Agreement which expressly required them to continue to pay their mortgage." ECF 56-3, ¶¶ 3-4. The Hebbelers do not dispute the identity of the parties.

As discussed by Judge Grimm in *Proctor v. Wells Fargo Bank, N.A.*, 289 F. Supp. 3d 676 (D. Md. 2018), "when a substitute trustee 'prosecute[s] [a] state court foreclosure action on behalf of [a mortgage servicer], which in turn serviced the underlying mortgage on behalf of [the lender],' the servicer, lender and substitute trustee share 'the same right to foreclose on the [subject] mortgage,' such that 'the privity component of claim preclusion is satisfied.'" *Id.* at 683 (quoting *Jones v. HSBC Bank USA, N.A.*, 444 F. App'x. 640, 644 (4th Cir. 2011)) (alterations in *Proctor*); *see also Anyanwutaku v. Fleet Mortg. Group, Inc.*, 85 F.Supp.2d 566, 571 (D. Md. 2000) (finding

"privity, under Maryland law, between substitute trustee who filed prior foreclosure action and successor holders of the underlying mortgage note").

Therefore, the first element of res judicata is satisfied.

### b. Identical Claims or Causes of Action

As noted, the identity of the claims between the Third Foreclosure Action and this case is the only element of res judicata that the Hebbelers contest. To determine whether a cause of action is "identical" for the purpose of res judicata, the Fourth Circuit and Maryland both apply a "transactional" approach. *See Schwartz v. J.J.F. Mgmt. Serv.*, *Inc.*, 922 F.3d 558, 566 (4th Cir. 2019); *SAS Inst.*, 874 F.3d at 378-79; *Clodfellter*, 720 F.3d at 210; *Norville*, 390 Md. at 108-09, 887 A.2d at 1037; *Kent Cty Bd. of Educ. v. Bilbrough*, 309 Md. 487, 499-500, 525 A.2d 232, 238 (1987). The transaction test provides that a claim is identical if it "'arises out of the same transaction or series of transactions as the claim resolved by the prior judgment'" and "'the claims could have been brought in the earlier action.'" *SAS Inst.*, 874 F.3d at 378-79 (quoting *Laurel Sand & Gravel*, 519 F.3d at 162); *see Norville*, 390 Md. at 108-09, 887 A.2d at 1037; *see* RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) cmt. c (1982). Put simply, the suits are identical where the claims asserted in both actions are based upon the same set of facts such that, ordinarily, one would expect them to be litigated simultaneously. *See Norville*, 390 Md. at 108-09, 887 A.2d at 1037.

The facts underpinning the Third Foreclosure Action and this case are the same. Hartman's Complaint in the Third Foreclosure Action is not appended to the FMB Motion. Hartman avers that he initiated the suit "because the Hebbelers failed to pay their mortgage for over sixteen (16) months and, as such, failed to comply with the Forbearance Agreement which expressly required them to continue to pay their mortgage." ECF 56-3, ¶ 4. Further, the Hebbelers' Motion to Stay,

as well as their Exceptions, contain factual allegations that are identical to those in the Complaint here, and reference the Forbearance Agreement. Notably, plaintiffs appended the Forbearance Agreement to their federal suit. *See* ECF 19 at 2. Moreover, Mr. Hebbeler submitted an Affidavit with the federal suit (ECF 2-1), referencing the Forbearance Agreement. *Id.* ¶ 15.

Paragraph 9 of the Complaint states:

> Prior to the commencement of the foreclosure action, FMB and the homeowners entered into a Forbearance Agreement on May 11, 2015. . . The Agreement was executed on May 13, 2015, but the homeowners began performing under the Agreement on May 11, 2015, as outlined below. At the time, the homeowners had defaulted on their mortgage, and the amount to cure the default was $101,931.66.

Paragraph 3 of the Motion to Stay is nearly identical to ¶ 9 of the Complaint. In the Motion to Stay, plaintiffs asserted, *id.* at 2:

> 3.      Prior to the commencement of this foreclosure action, FMB and the homeowners entered into a Forbearance Agreement on May 11, 2015. . . The Agreement was executed on May 13, 2015, but the homeowners began performing under the Agreement on May 11, 2015, as outlined below. At the time, the homeowners had defaulted on their mortgage, and the amount to cure the default was $101, 931.66.

And, they attached the Forbearance Agreement. ECF 56-6 at 27.

The language in ¶ 3 of the Hebbelers' Exceptions challenging the foreclosure sale is identical to the Motion to Stay. ECF 56-11 at 2. Thus, those allegations were before the circuit court at least twice, and certainly when it ratified the sale.

In the Complaint before this Court, ¶¶ 21-22 state as follows, ECF 2:

> 21.      By failing to provide an accurate accounting, and also by failing to simply agree to accept the $4,300.00 that the homeowners attempted to pay via Check Nos. 1448 and 1483, FMB breached the Forbearance Agreement.

> 22.      FMB, through its substitute trustees, filed a foreclosure action against the homeowners on September 11, 2017. This act constituted another breach of the Forbearance Agreement. Since the homeowners had honored their end of the Forbearance Agreement, the filing of the foreclosure action

constituted an act that FMB had no legal authorization to take in the collection of a consumer debt under principles of estoppel.

These assertions are substantially similar to the language in ¶¶ 15-16 of the Hebbelers' Motion to Stay, ECF 56-6 at 6. There, plaintiffs alleged, *id.*:

15. By failing to provide an accurate accounting, and also by failing to simply agree to accept the $4,300.00 that the homeowners attempted to pay via Check Nos. 1448 and 1483, FMB breached the Forbearance Agreement. FMB also thereby failed to grant loss mitigation that should have been granted.

16. FMB, through its substitute trustees, filed this foreclosure action against the homeowners on September 11, 2017. This act constituted another breach of the Forbearance Agreement. Since the homeowners had honored their end of the Forbearance Agreement, the filing of the foreclosure action constituted an act that FMB had no legal authorization to take in the collection of a consumer debt under principles of estoppel. This constituted a violation of the Maryland Consumer Debt Collection Practices Act under MD. CODE, COM. LAW § 14-202(8) and is yet another instance of unclean hands.

And, the language in ¶¶ 15 and 16 of the Hebbelers' Motion to Stay is identical to ¶¶ 15 and 16 of the Exceptions. ECF 56-11 at 6.

The Hebbelers also asserted violations of RESPA in their Motion to Stay and in their Exceptions. Paragraphs 9.1 through 9.8 in both submissions list communications the Hebbelers allegedly sent to FMB, which they claimed were "qualified written requests" under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e). They alleged that FMB failed to timely respond to them, in violation of RESPA. *See* ECF 56-6 at 3-5; ECF 56-11 at 4-5.

And, Hartman responded substantively to plaintiffs' Motion to Stay. ECF 56-7. He identified claims of "failure to apply payments; failure to correctly state amount; false affidavits and statutory noncompliance; failure to grant loss mitigation; equitable estoppel, unclean hands, and constitutional right to jury trial." *Id.* at 3. He argued in the response that none of the claims had merit. *Id.* at 3-6. As noted, the circuit court denied the Motion to Stay. ECF 56-8.

Thus, the Hebbelers' contention that the Third Foreclosure Action was based entirely on the mortgage note rather than the Forbearance Agreement is completely contrary to the record. There is no evidence in the record to support the argument that there is a distinction between the underlying transaction in the Third Foreclosure Action and the underlying transaction in this case. The Forbearance Agreement and the conduct of the parties involving it was litigated in state court.

And, to the extent that the allegations here differ from the Hebbelers' earlier claims, they are based on the same series of transactions—the mortgage note and the Forbearance Agreement— and their claims could have been raised in the Third Foreclosure Action. *See Prudencio v. Capital One, N.A.*, PWG-16-2693, 2016 WL 6947016, at *3 (D. Md. Nov. 28, 2016); *McCreary v. Benificial Mortg. Co. of Maryland*, No. AW-11-CV-01674, 2011 WL 4985437, at *4 (D. Md. Oct. 18, 2011) (dismissing on res judicata grounds plaintiff's claims, *inter alia*, for fraud, fraudulent misrepresentation, and intentional infliction of emotional distress, as "Plaintiff had a fair opportunity to present claims against Defendants during the prior foreclosure proceedings"). Thus, FMB has satisfied the second element of claim preclusion.

### 3. Final Judgment on the Merits

As noted, the Hebbelers do not contest that the Third Foreclosure Action was litigated to finality on the merits. Indeed, "the Hebbelers take issue only with the second element of res judicata—identical causes of action." ECF 57-1 at 20.

The Circuit Court for Baltimore County ratified the foreclosure sale on October 29, 2018. ECF 56-22 at 9. Ratification is a final judgment on the merits. *See, e.g.*, *Proctor*, 289 F.Supp.3d at 684 ("The ratification of sale constitutes a final judgment for preclusion purposes."). As Judge Chasanow explained in *McGhee v. JP Morgan Chase Bank, N.A.*, DKC-12-3072, 2013 WL 4495797, at *6 (D. Md. Aug. 20, 2013): "The important ruling in foreclosure cases is the circuit

court's ratification of the foreclosure sale. When a state court finalizes a foreclosure after the plaintiff was given an opportunity to raise all objections to the foreclosure sale of [a] property, that adjudication is a final judgment on the merits." (Internal quotations and citations omitted). *See also Gunter v. Agents for Int'l Monetary Fund Internal Revenue Serv.*, PWG-16-1386, 2017 WL 219374, at *4 (D. Md. Jan. 19, 2017).

On November 14, 2018, after the circuit court ratified the sale, the Hebbelers noted an appeal to the Maryland Court of Special Appeals. ECF 56-22 at 10. Hartman states in his Affidavit, ECF 56-3, ¶ 20: "The Hebbelers noted an appeal in the Foreclosure Case, but it was dismissed." That fact has not been controverted.

The Case Summary in the Hebbelers' appeal (Case No. CSA-REG-2899-2018) indicates that the Hebbelers filed two appeals: one on November 14, 2018, and a second on February 19, 2019. On May 12, 2019, the Hebbelers filed a Notice of Voluntary Dismissal. Thus, even assuming that finality was not achieved by the circuit court's entry of the Ratification of Sale, the final element of res judicata was met when the appeal was dismissed.

Because the elements of res judicata have been satisfied, I shall grant the FMB Motion as to the claims in the Complaint.

In the Hebbeler Defenses Motion (ECF 46), the Hebbelers have moved for summary judgment with respect to several of the Bank's affirmative defenses to the Complaint. In light of my disposition of the FMB Motion, I shall deny the Hebbeler Defenses Motion, as moot.

### B. The Counterclaims

As noted, the Bank lodged four Counterclaims against the Hebbelers. In particular, they allege fraud (Count I); tortious interference with economic relationships (Count II); breach of contract (Count III); and unjust enrichment (Count IV). *Id.* at 15-18. Count V asserts a Cross

Claim as to the SBA and a counterclaim as to the Hebbelers for declaratory judgment "articulating the fraud of the Hebbelers. . . ." *Id.* at 19.

FMB asserts these claims in reference to the Hebbelers' continued residence in the Property once it had been sold to the Rhynes and their affirmative representation to the SBA that they owned the Property during this period in order to obtain a disaster relief loan. ECF 42 at 14-15. This misrepresentation, according to the Bank, allowed the Hebbelers to obtain a loan from the SBA after the Property was sold and delayed the Bank's ability to close on the sale to the Rhynes. *Id.* at 15.

The Hebbelers have moved for summary judgment with respect to all of the Counterclaims. ECF 43. The Bank has moved for summary judgment with respect to Counts II and III of its Counterclaims. ECF 56-1 at 43.

### 1. Fraud

The plaintiffs seek summary judgment as to the Bank's fraud claim (Count I). That claim is predicated on alleged misrepresentations by the Hebbelers to the SBA. In particular, FMB asserts that the Hebbelers misrepresented to the SBA "that they are owners of the Property when, in fact, the Property was sold at public auction and the owners are actually the Rhynes." ECF 42 at 15.

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). Notably, "a cause of action for fraud" has "a strict requirement of scienter." *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 147, 838 A.2d 404, 433 (2003). "Recovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive." *Id.*; *see VF Corp. v. Wrexham*

*Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998); *Sass*, 152 Md. App. at 430, 832 A.2d at 260.

In an action for intentional or fraudulent misrepresentation, which is the garden variety of fraud and is often described simply as "fraud," the plaintiff ultimately must show:

> (1) that the defendant made a false representation to the plaintiff;
>
> (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
>
> (3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
>
> (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and
>
> (5) that the plaintiff suffered compensable injury resulting from the misrepresentation."

*Nails v. S & R, Inc.,* 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Gourdine v. Crews*, 405 Md. 722, 758, 955 A.2d 769, 791 (2008); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

As a preliminary matter, claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b). *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that an MCPA claim that "sounds in fraud[] is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").[9]

---

[9] Neither party has referenced Rule 9(b).

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Under the rule, a claim that sounds in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *U.S. ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citation omitted). In other words, Rule 9(b) requires the plaintiff to plead "the who, what, when, where, and how of the alleged fraud" before the parties can proceed to discovery. *U.S. ex rel. Wilson v. Kellogg Brown & Root*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted)

Rule 9(b) serves several salutary purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time,

place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

The Bank claims that on November 5, 2018, the Hebbelers "affirmatively represented" their ownership of the Property in a Deed of Trust. ECF 42 at 15; *see* ECF 56-13 at 6. As a result of this knowing misrepresentation, the Bank claims it was damaged by "perceived clouds on title. . . ." ECF 42 at 16. The resulting delay in the Hebbelers' eviction in turn delayed the ability of the Rhynes to take possession of the property and the Bank to gain the benefit of the foreclosure sale. *Id.*

The Hebbelers counter that there is no evidence that they made misleading statements to FMB with respect to the SBA loan; there is no evidence to show that they intended to deceive FMB; and there is no evidence that FMB itself relied on anything the Hebbelers said. ECF 43-1 at 9. Further, because the sale of the Property was ultimately completed, the Hebbelers argue that FMB was not injured. *Id.* Because the representation was made to the SBA, not the FMB, and because FMB cannot prove damages, the Hebbelers maintain that they are entitled to summary judgment with respect to the Bank's fraud claim. *Id.*

The Bank advances several arguments as to why it has raised genuine issues of material fact regarding the fraud claim. First, it points out that during discovery, the Hebbelers invoked "their Fifth Amendment right against self-incrimination regarding several of their answers and responses" concerning the SBA loan. ECF 56-1 at 44. Therefore, the Bank contends that it is entitled to a negative inference sufficient to defeat summary judgment on the fraud claim. *Id.* And, they contend that there is a genuine dispute regarding whether the Hebbelers represented

themselves to the SBA as the owners of the Property after the sale to the Rhynes was ratified. *Id.* According to the Bank, the Hebbelers obtained the SBA loan to prevent the Rhynes from closing on the Property, and indeed threatened to default on the SBA loan if the Rhynes did not sell the Property back to them. *Id.* Therefore, the Bank posits that it was damaged because it did not receive the interest payments it could have collected from the Rhynes "were they able to complete the sale of the Property on time." *Id.*

At the outset, I note that the Bank's arguments in its FMB Motion concerning the fraud allegations are far broader than what it pleaded in Count I. In the FMB Motion, the Bank contends that it has raised a genuine issue of material fact as to whether the Hebbelers committed fraud when they "fraudulently told Mr. Rojas that they had hand delivered two checks to the Bank that were improperly credited in order to simply continue to refuse to pay their mortgage." ECF 56-1 at 45. However, Count I pleaded only that the Hebbelers made misrepresentations to the SBA, which enabled them to obtain money from the "'equity' of the Property even when they are not owners of the Property." ECF 42 at 15. Specifically, the Bank alleged that the Hebbelers fraudulently obtained the SBA loan by holding themselves out as the owners of the Property even after the foreclosure sale was ratified. *Id.* The allegations pleaded in Count I do not concern fraud in statements to Rojas about the checks. Therefore, I will analyze the fraud claim only with respect to the allegations actually made in Count I.

The Bank has not provided evidence to show a genuine dispute with regard to the first, third, and fourth elements of the misrepresentation claim. There is no evidence in the record that, with regard to obtaining the SBA loan, the Hebbelers made any false statements to the Bank. In fact, there is no evidence that they made any statements to the Bank regarding the SBA loan at all. The only communications in the record regarding the SBA loan are the emails between Mr.

Hebbeler and James Henderson at the SBA, concerning the application and processing of the SBA loan. ECF 43-3 at 1.

As indicated, FMB notes that the Hebbelers invoked their "Fifth Amendment privilege against self-incrimination" in their supplemental responses to interrogatories with regard to the SBA loan. *See* ECF 56-25 at 3-4 (Supplemental Interrogatory Responses of Arthur Hebbeler); ECF 56-26 at 4-5 (Interrogatory Responses of Deborah Hebbeler); ECF 56-27 at 3-4 (Response to Request for Admissions of Deborah Hebbeler); ECF 56-28 at 3-5 (Response to Request for Admission of Arthur Hebbeler). "In a civil case, a negative inference may be drawn based on an assertion of Fifth-Amendment privilege, and as long as other evidence supports it, summary judgment may properly be given." *U.S. v. Sasscer*, Y-97-3026, 2000 WL 1683465, at *3 (D. Md. Nov. 8, 2000). However, the negative inference that the Hebbelers made fraudulent statements in the course of obtaining the SBA loan cannot support summary judgment on the fraud claim, because there is no evidence that those statements were made *to the Bank*.

Because there is no evidence in the record to show that the Hebbelers made a fraudulent statement to the Bank regarding the SBA loan, there is similarly no evidence that any such statement was made with the intent of defrauding the Bank or that the Bank relied on any such statement. Because the Bank has failed to show a genuine dispute of material fact with regard to these elements of fraud, I shall grant the Hebbeler Motion as to Count I.

## 2. Tortious Interference

Both the Hebbelers and the Bank have moved for summary judgment with respect to the Bank's claim for tortious interference. The tort of intentional interference with contractual or business relations is "well-established in Maryland." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 296, 639 A.2d 112, 116 (1994). Broadly stated, it provides that "one not privileged to do so

who purposely induces or causes a third person not to perform a contract or enter into or continue a business relation with another is liable for the harm caused thereby." *United Rental Equipment Co. v. Potts & Callahan Contracting Co.*, 231 Md. 552, 560, 191 A.2d 570, 574 (1963).

The Maryland Court of Appeals reiterated the elements of the tort in *Blondell v. Littlepage*, 413 Md. 96, 125, 991 A.2d 80, 97 (2010) (quoting *Kaser v. Financial Protection Marketing, Inc.*, 376 Md. 621, 628–29, 831 A.2d 49, 53 (2003)), as follows:

> A claim for intentional interference with contractual or business relations requires the following elements: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."

The tort has "two general manifestations." *Macklin*, 334 Md. at 297, 639 A.2d at 3. The first manifestation is often described as "'inducing the breach of an existing contract,'" and the second, "more broadly, constitutes maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Blondell*, 413 Md. at 125, 991 A.2d at 97 (citation omitted). In other words, under Maryland law, one may claim tortious interference with a contract, or, in the absence of a contract or breach of contract, one may claim tortious interference with business or economic relations.

The Bank alleges the second manifestation of the tort. It contends that the Hebbelers created "perceived clouds on title" of the Property by obtaining the SBA loan. ECF 42 at 16.

Notably, liability will only attach to an interference that is either "wrongful or unlawful ." *Travelers Indem. Co. v. Merling*, 326 Md. 329, 343, 605 A.2d 83, 90 (1992) (citation omitted); *see Gabaldoni v. Wash. Cnty. Hosp. Ass'n.*, 250 F.3d 255, 263 (4th Cir. 2001) (citing *Travelers*, 326 Md. at 343, 605 A.2d at 90). The Maryland Court of Appeals has explained that ". . . an act of tortious interference with economic relations is characterized by the defendant's specific purpose

to interfere, and. . . acts which incidentally affect another's business relationship are not a sufficient basis for the tort." *Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc.*, 336 Md. 635, 656, 650 A.2d 260, 270 (1994). Although, as a general matter, "wrongful conduct is incapable of precise definition," it is well established that when a party acts within its rights, that conduct is not wrongful "as a matter of law." *Macklin*, 334 Md. at 301–02, 639 A.2d at 119 (citing *Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 765, 511 A.2d 492, 498 (1986)).

The Hebbelers challenge the third and fourth elements of the tortious interference claim, and the Bank responded only to those arguments. The Hebbelers contend that FMB cannot show that their actions in taking out the SBA loan were wrongful or unlawful, because when they applied for and received the loan, the sale of the Property was not yet ratified and therefore they still owned it. ECF 43-1 at 10. They also contend the Bank has not been damaged because it ultimately received the entirety of the purchase price for the Property from the Rhynes. *Id.* at 11.

FMB counters that because the SBA Deed of Trust for the Property was executed on November 5, 2018, after the sale of the Property was ratified, the Hebbelers did not have a lawful right at that time to represent themselves as having an ownership interest in the property, as Hartman as the Bank's trustee had legal title, and the Rhynes had equitable title. ECF 56-1 at 47; ECF 56-13 at 6. Further, they contend that the perceived cloud on title created by the SBA loan, as well as the threats the Hebbelers made to the Rhynes to default on the SBA loan if the Rhynes did not sell the Property back to them, caused the Rhynes to "delay closing on the property for about one year, until the Hebbelers were evicted from the property. . . ." *Id.* According to FMB,

this delay caused the Bank to lose $4,000 per month in interest for about a year, totaling about $48,000. *Id.*

As noted, Rhyne signed the contract to purchase the Property on March 13, 2018. ECF 56-10. The sale of the Property was ratified on October 29, 2018. ECF 56-22 at 9. I cannot conclude, on this record, that the delay was attributable to plaintiffs. But, as of the date of the ratification of a foreclosure sale, "all rights of the mortgagors in the land are deemed to have ceased to exist as of the date of the sale." *Butler v. Daum*, 245 Md. 447, 453, 226 A.2d 261, 264 (1967); *see also Schweiger v. MidFirst Bank*, 2018 WL 1471680, at *3 (D. Md. Mar. 26, 2018) ("Although the ratification occurs some period of time after the foreclosure sale, once ratified, the foreclosure purchaser's title, both equitable and legal, is retroactive to the time of sale.").

The Maryland Court of Appeals explained long ago in *Union Trust Co. v. Biggs*, 153 Md. 50, 55-56, 137 A. 509, 512 (1927):

> After the foreclosure sale the purchaser had equitable interest in the land commensurate with that conferred by the mortgage deed, and he was entitled to the legal title upon the final ratification of the sale by the court and the payment of the purchase money. The assignee, on the other hand, held the legal title in trust for the purchaser for the completion of the sale by its ratification, the satisfaction of the purchase price, and the delivery of the deed. . . In short, after the sale, equity regarded the property in the land as in the buyer, and the property or the price as in the assignee and mortgagor.

From the time of ratification of the foreclosure sale on October 29, 2018, until the time the Rhynes paid the full purchase price on March 19, 2019, the Rhynes held equitable title. During that period, Hartman, the trustee for the Bank, held the legal title. Yet, as noted, the Hebbelers executed a Deed of Trust on November 5, 2018, in favor of the SBA, creating a lien on the

Property.  ECF 56-13.  When the Hebbelers executed the Deed of Trust on November 5, 2018, they had no legal right to hold themselves out as the owners of the Property.

The Hebbelers rely on *Plaza Corp. v. Alban Tractor Co.*, 219 Md. 570, 578 (1959), for the proposition that no title transfers to the purchaser until the purchase money is paid.  However, this case is inapposite, because it involves a chattel mortgage.

The Bank has also presented evidence of damages.  The Bank claims that it would have collected interest from the Rhynes on their mortgage payments during the year the Rhynes were prevented from completing the sale and taking possession of the Property.  Hartman states in his Affidavit that although the foreclosure sale was ratified in October 2018, the "Rhynes did not pay the $435,000 agreed to in the Contract for Sale until at least March 19, 2019."  ECF 56-3, ¶ 25. He claims that the delay was due to the "threat by the Hebbelers of defaulting on the SBA loan, as well as the inability of the Rhynes to obtain title insurance because of the SBA loan."  *Id.*  Further, he avers, *id.* ¶ 29:

> Further, in the foreclosure advertisement that sets forth the terms of the contract of sale between the Rhynes and me (as substitute trustee), the Rhynes should have been obligated to pay interest at the rate of 1% per month on the difference between the purchase price and the deposit, which in this instance would have been $4,000 per month.  Maryland case law requires that the interest be abated in the event of a lengthy challenge.  Even though the challenge mounted by the Hebbelers and the subsequent appeal were frivolous, they were sufficiently lengthy that Howard Bank was not permitted to collect the $4,000 per month for twelve (12) months totaling $48,000 lost interest income.

It is undisputed that Rhyne signed the contract of sale for the Property on March 13, 2018. ECF 56-10 at 1.  The contract of sale states: "The balance of the purchase price, together with the interest on such balance at the rate of twelve percent (12%) per annum from the date of sale to the date of settlement, is to be paid in cash or equivalent current funds on the date of settlement."  ECF 56-10 at 3.  It is also uncontested that the sale was ratified on October 29, 2018.  ECF 56-22 at 9.

The settlement statement was signed on March 19, 2019. ECF 43-7 at 1-2. FMB was unable to collect monies to which it was entitled. ECF 56-3, ¶ 29. Therefore, there is no genuine dispute as to the fact that FMB was damaged.

Neither side has discussed the second element of a tortious interference claim: that the act must be "calculated to cause damage to the plaintiffs in their lawful business." *Blondell*, 414 Md. 96, 125, 991 A.2d at 97. As I see it, there is a genuine dispute of material fact as to whether the Hebbelers intended to interfere with the Bank's contract with the Rhynes when they sought the SBA loan. As a result, I shall deny the Hebbeler Motion and the FMB Motion as to Count II.

### 3. Breach of Contract

The Bank alleges that the plaintiffs are liable for breach of contract. However, in Count III, the Bank does not identify the contract or agreements that are at issue. Nor does the Bank specify the particular contractual provisions.

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *see RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). In *Polek v. J.P. Morgan Chase Bank*, N.A., 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said: "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the

plaintiff and a breach of that obligation by defendant.'" (Citation omitted); *see also Robinson v. GEO Licensing Co.*, L.L.C., 173 F. Supp. 2d 419, 423 (D. Md. 2001).

FMB alleges that, when the Hebblers executed the Deed of Trust with the SBA on November 5, 2018, they breached agreements with the Bank that they would "not make representations related to the ownership of the Property, not seek additional loans related to the Property and not engage in fraud concerning the Property or related to the Property." ECF 42 at 17. As mentioned, the Bank does not identify any particular contract, in a case involving many contracts.

For their part, the Hebbelers contend that they did not breach any agreements with the Bank. ECF 43-1 at 12. They maintain that no agreement "prohibits the Hebbelers from misrepresenting to third parties their ownership interests in the property." *Id.*

In response, the Bank points out that the Hebbelers have failed to consider the Forbearance Agreement. ECF 56-1 at 48. In that Agreement, according to the Bank, the Hebbelers agreed "to work with the Bank in the event of a default and foreclosure sale and not to create unnecessary obstacles and relinquish the Property in the event of a foreclosure proceeding." *Id.*

The Forbearance Agreement states, in relevant part, ECF 56-5 at 5:

Section 13.  Cooperation with Lender Upon an Event of Default.  Upon the occurrence of an Event of Default under this Agreement, the Obligors affirmatively and irrevocably consent to the foreclosure, repossession, and sale of the Property by the Lender under the Loan Documents and this Agreement.  In such event, the Obligors further covenant and agree: (i) not to oppose, challenge, hinder, or delay the Lender's foreclosure, repossession, and sale of the Property in any manner and under any circumstances; (ii) not to cause or encourage other interested or uninterested parties to challenge, hinder, or delay any foreclosure, repossession, and sale of the Property; (iii) not to file an action seeking any form of injunctive relief with respect to, or which may have the effect of hindering or delaying the foreclosure, repossession, and sale of the Property including, without limitation, any petition in State, Federal, or Bankruptcy Courts, or any other type of legal or equitable action seeking to oppose, challenge, enjoin, or delay the foreclosure, repossession or sale.  The Obligors also affirmatively and irrevocably waive: (a)

any legal or equitable defense to the foreclosure, repossession, and sale; (b) the right to file exceptions or any other form of objections to the foreclosure sale; and (c) any right of redemption with respect to the foreclosure (if any). . . The Obligors also covenant and agree to fully cooperate with and assist the Lender, including without limitation, any attorney, title company, appraiser, or auctioneer retained by the Lender, in order to facilitate an orderly foreclosure and/or resale or reconveyance of the Property after any foreclosure sale. . .

The Bank's Counterclaim does not reference this Agreement. And, it is well settled that a claim in a suit cannot be amplified by an assertion in a motion. *See, e.g.*, *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (noting that it is "axiomatic" that a claim cannot be amplified by briefing in opposition to a dispositive motion) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)). Therefore, the Bank cannot cure the flawed and deficient claim by citing to the Forbearance Agreement.

I shall grant the Hebbeler Motion as to Count III of the Counterclaims. And, given the age and posture of the case, I shall deny the Bank the opportunity to amend.

## IV. Unjust Enrichment

The Hebbelers seek summary judgment as to Count IV of the Counterclaims, in which the Bank alleges a claim for unjust enrichment.

This claim implicates the distinctions in Maryland between an "express contract," a "contract implied-in-fact," and a "contract implied-in-law." In *Dolan v. McQuaide*, 215 Md. App. 24, 37, 79 A.3d 394, 402 (2013), the Maryland Court of Special Appeals said (emphasis in original): "This taxonomy can be summed up, as follows: 1) an express contract arises from *verbal* communication of *definite terms;* 2) a contract implied-in-fact arises from *actions* implying *definite terms;* and 3) unjust enrichment arises from *actions* that do *not* imply *definite terms.*"[]

"An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit

language, either orally or in writing." *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)) (emphasis omitted).

A contract implied-in-fact, or an "implied contract," is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men." *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688; *see also Dashiell*, 358 Md. at 94, 747 A.2d at 606 ("An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.") (internal quotation and citations omitted).

An implied-in-fact contract "is 'inferred from conduct of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services.'" *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 (citation omitted); *see Mogavero v. Silverstein*, 142 Md. App. 259, 275, 790 A.2d 43, 52 (2002) ("An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'"); *Slick v. Reinecker*, 154 Md. App. 312, 318, 839 A.2d 784, 787 (2003) ("'The term [implied in fact contract] only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'") (quoting *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md. App. 766, 774, 471 A.2d 1121 (1984)) (emphasis omitted) (bracketed comments added in *Slick*).

Thus, an implied-in-fact contract "'*refers to that class of obligations which arises from mutual agreement and intent to promise*, when the agreement and promise have *simply not been*

*expressed in words.* Despite the fact that no words of promise or agreement have been used, *such transactions are nevertheless true contracts*, and may properly be called inferred contracts or contracts implied in fact.'" *Mohiuddin v. Doctors Billing & Management Solutions, Inc.* 196 Md. App. 439, 448, 9 A.3d 859, 865 (2010) (quoting 1 Richard A. Lord, *Williston on Contracts*, § 1.5, pp. 20-21 (1990)) (emphasis in *Mohiuddin*). "Recovery on a contract implied in fact . . . is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services." *Mogavero*, 142 Md. App. at 276, 790 A.2d at 53.

A contract implied-in-law, also known as a "quasi-contract," or unjust enrichment, is a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Maryland Cas. Co.*, 442 Md. at 707, 114 A.2d at 689 (emphasis and citations omitted); *see Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (quoting Restatement (Second) of Contracts, § 4 (1981)); *accord Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 ("A contract implied by law is now what commonly is called quasi-contract . . . ."). However, "'unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. *They are obligations created by law for reasons of justice.*'" *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (citation omitted) (emphasis in *Mohiuddin*).

Under Maryland law, a quasi-contract claim may not be brought where the subject matter of the claim is covered by an express contract between the parties. *Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008) (internal quotation marks omitted); *see also Dashiell*, 358 Md. at 101, 747 A.2d at 610 ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and

remedies of the parties exists."); *see also FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

In Maryland, "[a] claim of unjust enrichment is established when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651–52, 887 A.2d 525, 546 (2005) (citation omitted); *see also Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007); *J. Roland Dashiell & Sons, Inc.*, 358 Md. at 95 n.7, 747 A.2d at 607 n.7; *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, cert. denied, 406 Md. 444, 959 A.2d 793 (2008); *Swedish Civil Aviation Admin. v. Project Mgmt. Enter., Inc.*, 190 F.Supp.2d 785, 792-93 (D. Md. 2002).

"A successful unjust enrichment claim serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'" *Hill*, 402 Md. at 295–96, 936 A.2d at 352 (citation omitted); *see also Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151, 757 A.2d 108, 113 (2000). But, "[g]enerally, courts are hesitant to deviate from the principle of the rule and allow unjust enrichment claims only when there is evidence of fraud or bad faith,[ ] there has been a breach of contract or a mutual rescission

of the contract, when rescission is warranted,[ ] or when the express contract does not fully address a subject matter.[ ]" *J. Roland Dashiell & Sons, Inc.*, 358 Md. at 100, 747 A.2d at 608–09.

As indicated, a claim for unjust enrichment is not viable when the subject matter of a claim is governed by an express contract between the parties. *See Janusz v. Gilliam*, 404 Md. at 537, 947 A.2d at 567 ("In Maryland, a claim of unjust enrichment, which is a quasi-contract claim, may not be brought where the subject matter of the claim is covered by an express contract between the parties.") (Internal quotation marks omitted); *J. Roland Dashiell & Sons, Inc.*, 358 Md. at 101, 747 A.2d at 610 ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists."); *see also FLF, Inc. v. World Publications, Inc.*, 999 F.Supp. 640, 642 (D. Md.1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

FMB alleges that since March 2016, the Hebbelers have "retained possession of the Property without making any payments on their mortgage for residing in the Property." ECF 42 at 18, ¶ 22. And, the Bank claims the Hebbelers were unjustly enriched by the loan from the SBA that they fraudulently obtained. *Id.* The Bank alleges it has been damaged as a result. *Id.*

The Hebbelers reiterate that, in their view, they were within their rights to obtain the SBA loan. ECF 43-1 at 12. And, they claim that the unjust enrichment claim regarding their failure to pay their mortgage is "a poorly pleaded breach of contract action" and is duplicative of the "ongoing state court action related to a potential deficiency judgment" in state court. *Id.*

The Bank contends it has raised factual disputes concerning the SBA loan and the mortgage payments. ECF 56-1 at 49. It argues that it has provided evidence that the Hebbelers benefited by

living in the Property without making mortgage payments to the Bank. *Id.* It also argues that the Hebbelers did not have a right to obtain the SBA loan after sale but prior to ratification. *Id.* at 50. Thus, they had "no right to receive the benefit of the SBA loan to the detriment of the Bank." *Id.* It contends that the enrichment of the SBA loan is "separate from and unrelated to the Hebbelers' breach of the Forbearance Agreement." *Id.*

FMB did not confer a benefit on the Hebbelers when the Hebbelers obtained the SBA loan. As a result, the SBA loan cannot be the basis of an unjust enrichment claim by the Bank. As to the Hebbelers remaining in the Property without paying their mortgage, the mortgage payments and the arrears payments were covered by express contracts: the note the Hebbelers executed in 2002, which specified that the monthly mortgage payment was $2,936.71 (ECF 56-24 at 1) and the Forbearance Agreement, which specified the installments the Hebbelers needed to make to avoid foreclosure. ECF 56-5.

An unjust enrichment claim may not be brought when the subject matter of the claim is governed by a contract. "Although a plaintiff may plead in the alternative by asserting claims for unjust enrichment and breach of contract, when doing so the 'plaintiff's claim for unjust enrichment *must* include an allegation of fraud or bad faith in the formation of the contract.'" *J.E. Dunn Const. Co. v. S.R.P. Development Ltd. Partnership*, 115 F. Supp. 3d 593, 608 (D. Md. 2015) (quoting *Jones v. Pohanka Auto North, Inc.*, 43 F. Supp. 3d 554, 573 (D. Md. 2014) (emphasis in original). The Bank has not made any allegations of fraud or bad faith as to the Foreclosure

Agreement or the original loan documents. Accordingly, I shall grant summary judgment to the Hebbelers as to Count IV.

## V.    Declaratory Judgment

In the federal courts, declaratory judgments are authorized by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), which provides, with exceptions not relevant here, that, in "a case of actual controversy within its jurisdiction,...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration. . . ."  In addition, "the granting of declaratory judgment is entrusted to the discretion of the district court."  *Great Am. Ins. Co. v. Gross*, 468 F.3d 199, 209 (4th Cir. 2006).

The Fourth Circuit has indicated that a court should adjudicate a declaratory judgement action "when it finds that the declaratory relief sought (i) will serve a useful purpose in clarifying and settling the legal relations in issue, and (ii) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994) (internal quotation marks omitted).

In Count V, FMB seeks a declaratory judgment against the Hebbelers "articulating the fraud of the Hebbelers" so as to allow the Bank to "recover fully from the foreclosure sale."  ECF 42 at 18-19.  The Hebbelers contend that because the Bank's underlying claims are not valid, this

claim should be dismissed. ECF 43-1 at 14. The Bank counters that it has provided evidence for "multiple valid claims" and is therefore entitled to declaratory judgment. ECF 56-1 at 51.

As discussed, *supra*, I shall grant summary judgment to the Hebbelers on the Bank's fraud claim. And, I have dismissed the suit as against the SBA, because the SBA was not served. I see no basis for declaratory relief.

## VI.    Conclusion

For the reasons set forth above, I shall grant the FMB Motion as to plaintiffs' Complaint. And, because the Hebbeler Defenses Motion is dependent on the Complaint, I shall deny it, as moot. I shall grant the Hebbeler Motion as to Counts I, III, IV and V of the Counterclaims. I shall deny it as to Count II of the Counterclaims. And, I shall deny the FMB Motion as to Counts II and III of the Counterclaims.

An Order follows.

Date:  March 2, 2020                                        /s/
                                                 Ellen L. Hollander
                                                 United States District Judge